(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## PAROLINE *v.* UNITED STATES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 12–8561.   Argued January 22, 2014—Decided April 23, 2014

The respondent victim in this case was sexually abused as a young girl in order to produce child pornography.  When she was 17, she learned that images of her abuse were being trafficked on the Internet, in effect repeating the original wrongs, for she knew that her humiliation and hurt would be renewed well into the future as thousands of additional wrongdoers witnessed those crimes.  Petitioner Paroline pleaded guilty in federal court to possessing images of child pornography, which included two of the victim, in violation of 18 U. S. C. §2252. The victim then sought restitution under §2259, requesting nearly $3 million in lost income and about $500,000 in future treatment and counseling costs.  The District Court declined to award restitution, concluding that the Government had not met its burden of proving what losses, if any, were proximately caused by Paroline's offense. The victim sought a writ of mandamus, asking the Fifth Circuit to direct the District Court to order Paroline to pay restitution.  Granting the writ on rehearing en banc, the Fifth Circuit held, *inter alia*, that §2259 did not limit restitution to losses proximately caused by the defendant, and that each defendant who possessed the victim's images should be made liable for the victim's entire losses from the trade in her images.

*Held:*

  1. Restitution is proper under §2259 only to the extent the defendant's offense proximately caused a victim's losses.  This provision has a broad restitutionary purpose, stating that a district court "shall order restitution for any offense" under Chapter 110 of Title 18, such as Paroline's possession offense; requiring district courts to order defendants "to pay the victim . . . the full amount of the victim's losses as determined by the court," §2259(b)(1); and expressly making "is-

suance of a restitution order . . . mandatory," §2259(b)(4)(A).   The Government has the "burden of demonstrating the amount of the [victim's] loss."  §3664(e).

To say one event proximately caused another means, first, that the former event caused the latter, *i.e.,* actual cause or cause in fact; and second, that it is a proximate cause, *i.e.,* it has a sufficient connection to the result.  The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances.  Section 2259(c) defines a victim as "the individual harmed as a result of a commission of a crime under this chapter."  The words "as a result of" plainly suggest causation, and the referent of "a crime" is the offense of conviction.  The "full amount of the victim's losses," §2259(b)(1), includes "any costs incurred by the victim" for six enumerated categories of expense, §2259(b)(3).  The reference to "costs incurred by the victim" is most naturally understood as costs arising "as a result of" the offense of conviction, *i.e.,* the defendant's conduct.  And the last of the six enumerated categories—for "other losses suffered . . . as a proximate result of the offense," §2259(b)(3)(F)—clearly states that the causal requirement is one of proximate cause.  This reading is supported by the canon of construction that, "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."  *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348.  The reading also presents a commonsense way to impose sensible limitations on claims for attenuated costs.  Pp. 5–11.

2. Applying the statute's causation requirements in this case, victims should be compensated and defendants should be held to account for the impact of their conduct on those victims, but defendants should only be made liable for the consequences and gravity of their own conduct, not the conduct of others.  Pp. 11–25.

(a) A somewhat atypical causal process underlies the losses here. It may be simple to prove aggregate losses, *i.e.,* "general losses," stemming from the ongoing traffic in the victim's images, but the question for §2259 purposes is how much of these general losses were the "proximate result" of an individual defendant's offense.  Here, the victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes, provided the prerequisite of factual causation is satisfied.  The primary problem, then, is the proper standard of causation in fact.  Pp. 11–12.

(b) A showing of but-for causation is not the proper standard here, for it is not possible to prove that the victim's losses would be less but for one possessor's individual role in the large, loosely con-

nected network through which her images circulate. The victim and the Government urge the Court to read §2259 to require a less restrictive causation standard in child-pornography cases like this. They endorse the theory of "aggregate causation," one formulation of which finds factual causation satisfied where a wrongdoer's conduct, though alone "insufficient . . . to cause the plaintiff's harm," is, "when combined with conduct by other persons," "more than sufficient to cause the harm." 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm §27, Comment *f*. Tort law teaches that such alternative causal tests, though a kind of legal fiction, may be necessary to vindicate the law's purposes, for it would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm, and nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many would have no redress, while those hurt by the acts of one person alone would. These are sound principles. Taken too far, however, such alternative causal standards would treat each possessor as the cause in fact of all the trauma and attendant losses incurred as a result of all the ongoing traffic in the victim's images. Aggregate causation logic should not be adopted in an incautious manner in the context of criminal restitution, which differs from tort law in numerous respects. Paroline's contribution to the causal process underlying the victim's losses was very minor, both compared to the combined acts of all other relevant offenders and compared to the contributions of other individual offenders, particularly distributors and the initial producer of the child pornography. Congress gave no indication that it intended the statute to be applied in an expansive manner so starkly contrary to the principle that restitution should reflect the consequences of the defendant's own conduct. The victim claims that holding each possessor liable for her entire losses would be fair and practical in part because offenders can seek contribution from one another, but there is no general federal right to contribution and no specific statutory authorization for contribution here. Her severe approach could also raise questions under the Excessive Fines Clause of the Eighth Amendment. Pp. 12–19.

(c) While the victim's expansive reading must be rejected, that does not mean the broader principles underlying aggregate causation theories are irrelevant to determining the proper outcome in cases like this. The cause of the victim's general losses is the trade in her images, and Paroline is a part of that cause. Just as it undermines the purposes of tort law to turn away plaintiffs harmed by several wrongdoers, it would undermine §2259's purposes to turn away victims in cases like this. With respect to the statute's remedial pur-

pose, there is no question that it would produce anomalous results to say that no restitution is appropriate in these circumstances, for harms of the kind the victim endured here are a major reason why child pornography is outlawed. The unlawful conduct of everyone who reproduces, distributes, or possesses images of the victim's abuse—including Paroline—plays a part in sustaining and aggravating this tragedy. And there is no doubt Congress wanted restitution for such victims. Denying restitution would also be at odds with §2259's penological purposes, which include the need to impress upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims. Thus, where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in her images but where it is impossible to trace a particular amount of those losses to the individual defendant utilizing a more traditional causal inquiry, a court should order restitution in an amount that comports with the defendant's relative role in the causal process underlying the victim's general losses.

District courts should use discretion and sound judgment in determining the proper amount of restitution. A variety of factors may serve as guideposts. Courts might, as a start, determine the amount of the victim's losses caused by the continuing traffic in the victim's images, and then base an award on factors bearing on the relative causal significance of the defendant's conduct in producing those losses. The victim finds this approach untenable because her losses are "indivisible," but the Court is required to define a causal standard that effects the statute's purposes, not to apply tort-law concepts in a mechanical way in the criminal restitution context. She also argues she will be consigned to "piecemeal" restitution that may never lead to full recovery, but Congress has not promised victims full and swift restitution at the cost of holding a defendant liable for an amount drastically out of proportion to his individual causal relation to those losses. Furthermore, this approach better effects the need to impress upon defendants that their acts are not irrelevant or victimless. Pp. 19–25.

(d) Though this approach is not without difficulties, courts can only do their best to apply the statute as written in a workable manner, faithful to the competing principles at stake: that victims should be compensated and that defendants should be held to account for the impact of their own conduct, not the conduct of others. District courts, which routinely exercise wide discretion both in sentencing generally and in fashioning restitution orders, should be able to apply the causal standard defined here without further detailed guidance. P. 25.

Syllabus

701 F. 3d 749, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, ALITO, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which SCALIA and THOMAS, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–8561

## DOYLE RANDALL PAROLINE, PETITIONER *v.* UNITED STATES, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 23, 2014]

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents the question of how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed. The relevant statutory provisions are set forth at 18 U. S. C. §2259. Enacted as a component of the Violence Against Women Act of 1994, §2259 requires district courts to award restitution for certain federal criminal offenses, including child-pornography possession.

Petitioner Doyle Randall Paroline pleaded guilty to such an offense. He admitted to possessing between 150 and 300 images of child pornography, which included two that depicted the sexual exploitation of a young girl, now a young woman, who goes by the pseudonym "Amy" for this litigation. The question is what causal relationship must be established between the defendant's conduct and a victim's losses for purposes of determining the right to, and the amount of, restitution under §2259.

I

Three decades ago, this Court observed that "the ex-

ploitive use of children in the production of pornography has become a serious national problem." *New York* v. *Ferber*, 458 U. S. 747, 749 (1982). The demand for child pornography harms children in part because it drives production, which involves child abuse. The harms caused by child pornography, however, are still more extensive because child pornography is "a permanent record" of the depicted child's abuse, and "the harm to the child is exacerbated by [its] circulation." *Id.*, at 759. Because child pornography is now traded with ease on the Internet, "the number of still images and videos memorializing the sexual assault and other sexual exploitation of children, many very young in age, has grown exponentially." United States Sentencing Comm'n, P. Saris et al., Federal Child Pornography Offenses 3 (2012) (hereinafter Sentencing Comm'n Report).

One person whose story illustrates the devastating harm caused by child pornography is the respondent victim in this case. When she was eight and nine years old, she was sexually abused by her uncle in order to produce child pornography. Her uncle was prosecuted, required to pay about $6,000 in restitution, and sentenced to a lengthy prison term. The victim underwent an initial course of therapy beginning in 1998 and continuing into 1999. By the end of this period, her therapist's notes reported that she was "'back to normal'"; her involvement in dance and other age-appropriate activities, and the support of her family, justified an optimistic assessment. App. 70–71. Her functioning appeared to decline in her teenage years, however; and a major blow to her recovery came when, at the age of 17, she learned that images of her abuse were being trafficked on the Internet. *Id.*, at 71. The digital images were available nationwide and no doubt worldwide. Though the exact scale of the trade in her images is unknown, the possessors to date easily number in the thousands. The knowledge that her images

were circulated far and wide renewed the victim's trauma
and made it difficult for her to recover from her abuse. As
she explained in a victim impact statement submitted to
the District Court in this case:

> "Every day of my life I live in constant fear that some-
> one will see my pictures and recognize me and that I
> will be humiliated all over again. It hurts me to know
> someone is looking at them—at me—when I was just
> a little girl being abused for the camera. I did not
> choose to be there, but now I am there forever in pic-
> tures that people are using to do sick things. I want it
> all erased. I want it all stopped. But I am powerless
> to stop it just like I was powerless to stop my un-
> cle. . . . My life and my feelings are worse now because
> the crime has never really stopped and will never re-
> ally stop. . . . It's like I am being abused over and over
> and over again." *Id.*, at 60–61.

The victim says in her statement that her fear and trauma
make it difficult for her to trust others or to feel that she
has control over what happens to her. *Id.*, at 63.

The full extent of this victim's suffering is hard to grasp.
Her abuser took away her childhood, her self-conception of
her innocence, and her freedom from the kind of night-
mares and memories that most others will never know.
These crimes were compounded by the distribution of
images of her abuser's horrific acts, which meant the
wrongs inflicted upon her were in effect repeated; for she
knew her humiliation and hurt were and would be re-
newed into the future as an ever-increasing number of
wrongdoers witnessed the crimes committed against her.

Petitioner Paroline is one of the individuals who pos-
sessed this victim's images. In 2009, he pleaded guilty in
federal court to one count of possession of material involv-
ing the sexual exploitation of children in violation of 18
U. S. C. §2252. 672 F. Supp. 2d 781, 783 (ED Tex. 2009).

Paroline admitted to knowing possession of between 150 and 300 images of child pornography, two of which depicted the respondent victim. *Ibid.* The victim sought restitution under §2259, asking for close to $3.4 million, consisting of nearly $3 million in lost income and about $500,000 in future treatment and counseling costs. App. 52, 104. She also sought attorney's fees and costs. 672 F. Supp. 2d, at 783. The parties submitted competing expert reports. They stipulated that the victim did not know who Paroline was and that none of her claimed losses flowed from any specific knowledge about him or his offense conduct. *Id.*, at 792, and n. 11; App. 230.

After briefing and hearings, the District Court declined to award restitution. 672 F. Supp. 2d, at 793. The District Court observed that "everyone involved with child pornography—from the abusers and producers to the end-users and possessors—contribute[s] to [the victim's] ongoing harm." *Id.*, at 792. But it concluded that the Government had the burden of proving the amount of the victim's losses "directly produced by Paroline that would not have occurred without his possession of her images." *Id.*, at 791. The District Court found that, under this standard, the Government had failed to meet its burden of proving what losses, if any, were proximately caused by Paroline's offense. It thus held that "an award of restitution is not appropriate in this case." *Id.*, at 793.

The victim sought a writ of mandamus, asking the United States Court of Appeals for the Fifth Circuit to direct the District Court to order Paroline to pay restitution in the amount requested. *In re Amy*, 591 F. 3d 792, 793 (2009). The Court of Appeals denied relief. *Id.*, at 795. The victim sought rehearing. Her rehearing request was granted, as was her petition for a writ of mandamus. *In re Amy Unknown*, 636 F. 3d 190, 201 (2011).

The Fifth Circuit reheard the case en banc along with another case, in which the defendant, Michael Wright, had

raised similar issues in appealing an order of restitution under §2259, see *United States* v. *Wright*, 639 F. 3d 679, 681 (2011) (*per curiam*). As relevant, the Court of Appeals set out to determine the level of proof required to award restitution to victims in cases like this. It held that §2259 did not limit restitution to losses proximately caused by the defendant, and each defendant who possessed the victim's images should be made liable for the victim's entire losses from the trade in her images, even though other offenders played a role in causing those losses. *In re Amy Unknown*, 701 F. 3d 749, 772–774 (2012) (en banc).

Paroline sought review here. Certiorari was granted to resolve a conflict in the Courts of Appeals over the proper causation inquiry for purposes of determining the entitlement to and amount of restitution under §2259. 570 U. S. ___ (2013). For the reasons set forth, the decision of the Court of Appeals is vacated.

## II

Title 18 U. S. C. §2259(a) provides that a district court "shall order restitution for any offense" under Chapter 110 of Title 18, which covers a number of offenses involving the sexual exploitation of children and child pornography in particular. Paroline was convicted of knowingly possessing child pornography under §2252, a Chapter 110 offense.

Section 2259 states a broad restitutionary purpose: It requires district courts to order defendants "to pay the victim . . . the full amount of the victim's losses as determined by the court," §2259(b)(1), and expressly states that "[t]he issuance of a restitution order under this section is mandatory," §2259(b)(4)(A). Section 2259(b)(2) provides that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664," which in turn provides in relevant part that "[t]he burden of demonstrating the amount of the loss sustained by a

victim as a result of the offense shall be on the attorney for the Government," §3664(e).

The threshold question the Court faces is whether §2259 limits restitution to those losses proximately caused by the defendant's offense conduct. The Fifth Circuit held that it does not, contrary to the holdings of other Courts of Appeals to have addressed the question. Compare, *e.g.*, 701 F. 3d, at 752 (no general proximate-cause requirement applies under §2259), with *United States* v. *Rogers*, 714 F. 3d 82, 89 (CA1 2013) (general proximate-cause requirement applies under §2259); *United States* v. *Benoit*, 713 F. 3d 1, 20 (CA10 2013) (same); *United States* v. *Fast*, 709 F. 3d 712, 721–722 (CA8 2013) (same); *United States* v. *Laraneta*, 700 F. 3d 983, 989–990 (CA7 2012) (same); *United States* v. *Burgess*, 684 F. 3d 445, 456–457 (CA4 2012) (same); *United States* v. *Evers*, 669 F. 3d 645, 659 (CA6 2012) (same); *United States* v. *Aumais*, 656 F. 3d 147, 153 (CA2 2011) (same); *United States* v. *Kennedy*, 643 F. 3d 1251, 1261 (CA9 2011) (same); *United States* v. *Monzel*, 641 F. 3d 528, 535 (CADC 2011) (same); *United States* v. *McDaniel*, 631 F. 3d 1204, 1208–1209 (CA11 2011) (same).

As a general matter, to say one event proximately caused another is a way of making two separate but related assertions. First, it means the former event caused the latter. This is known as actual cause or cause in fact. The concept of actual cause "is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it." 4 F. Harper, F. James, & O. Gray, Torts §20.2, p. 100 (3d ed. 2007).

Every event has many causes, however, see *ibid.*, and only some of them are proximate, as the law uses that term. So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies

easy summary. It is "a flexible concept," *Bridge* v. *Phoenix Bond & Indemnity Co.*, 553 U. S. 639, 654 (2008), that generally "refers to the basic requirement that . . . there must be 'some direct relation between the injury asserted and the injurious conduct alleged,'" *CSX Transp., Inc.* v. *McBride*, 564 U. S. ___, ___ (2011) (ROBERTS, C. J., dissenting) (slip op., at 3) (quoting *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 268 (1992)). The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. 1 W. LaFave, Substantive Criminal Law §6.4(c), p. 471 (2d ed. 2003) (hereinafter LaFave). Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. See, *e.g.*, *ibid.*; 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm §29, p. 493 (2005) (hereinafter Restatement). A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity. *Exxon Co., U. S. A.* v. *Sofec, Inc.*, 517 U. S. 830, 838–839 (1996).

All parties agree §2259 imposes some causation requirement. The statute defines a victim as "the individual harmed as a result of a commission of a crime under this chapter." §2259(c). The words "as a result of" plainly suggest causation. See *Pacific Operators Offshore, LLP* v. *Valladolid*, 565 U. S. ___, ___ (2012) (slip op., at 13); see also *Burrage* v. *United States*, 571 U. S. ___, ___ (2014) (slip op., at 5). And a straightforward reading of §2259(c) indicates that the term "a crime" refers to the offense of conviction. Cf. *Hughey* v. *United States*, 495 U. S. 411, 416 (1990). So if the defendant's offense conduct did not cause harm to an individual, that individual is by definition not a "victim" entitled to restitution under §2259.

As noted above, §2259 requires a court to order restitu-

tion for "the full amount of the victim's losses," §2259(b)(1), which the statute defines to include "any costs incurred by the victim" for six enumerated categories of expense, §2259(b)(3). The reference to "costs incurred by the victim" is most naturally understood as costs stemming from the source that qualifies an individual as a "victim" in the first place—namely, ones arising "as a result of" the offense. Thus, as is typically the case with criminal restitution, §2259 is intended to compensate victims for losses caused by the offense of conviction. See *id.*, at 416. This is an important point, for it means the central concern of the causal inquiry must be the conduct of the particular defendant from whom restitution is sought.

But there is a further question whether restitution under §2259 is limited to losses proximately caused by the offense. As noted, a requirement of proximate cause is more restrictive than a requirement of factual cause alone. Even if §2259 made no express reference to proximate causation, the Court might well hold that a showing of proximate cause was required. Proximate cause is a standard aspect of causation in criminal law and the law of torts. See 1 LaFave §6.4(a), at 464–466; W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §41, p. 263 (5th ed. 1984) (hereinafter Prosser and Keeton). Given proximate cause's traditional role in causation analysis, this Court has more than once found a proximate-cause requirement built into a statute that did not expressly impose one. See *Holmes*, *supra*, at 265–268; *Associated Gen. Contractors of Cal., Inc.* v. *Carpenters*, 459 U. S. 519, 529–536 (1983); see also *CSX Transp., Inc.*, *supra*, at ___ (ROBERTS, C. J., dissenting) (slip op., at 4) ("We have applied the standard requirement of proximate cause to actions under federal statutes where the text did not expressly provide for it"); *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, *ante*, at 13–14.

Here, however, the interpretive task is easier, for the requirement of proximate cause is in the statute's text. The statute enumerates six categories of covered losses. §2259(b)(3). These include certain medical services, §2259(b)(3)(A); physical and occupational therapy, §2259(b)(3)(B); transportation, temporary housing, and child care, §2259(b)(3)(C); lost income, §2259(b)(3)(D); attorney's fees and costs, §2259(b)(3)(E); and a final catchall category for "any other losses suffered by the victim as a proximate result of the offense," §2259(b)(3)(F).

The victim argues that because the "proximate result" language appears only in the final, catchall category of losses set forth at §2259(b)(3)(F), the statute has no proximate-cause requirement for losses falling within the prior enumerated categories. She justifies this reading of §2259(b) in part on the grammatical rule of the last antecedent, "according to which a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart* v. *Thomas*, 540 U. S. 20, 26 (2003). But that rule is "not an absolute and can assuredly be overcome by other indicia of meaning." *Ibid.* The Court has not applied it in a mechanical way where it would require accepting "unlikely premises." *United States* v. *Hayes*, 555 U. S. 415, 425 (2009).

Other canons of statutory construction, moreover, work against the reading the victim suggests. "When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Porto Rico Railway, Light & Power Co.* v. *Mor*, 253 U. S. 345, 348 (1920). Furthermore, "[i]t is . . . a familiar canon of statutory construction that [catchall] clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated." *Federal Maritime Comm'n* v. *Seatrain Lines, Inc.*, 411 U. S. 726, 734 (1973). Here, §2259(b)(3)(F) defines a

broad, final category of "other losses suffered . . . as a proximate result of the offense." That category is most naturally understood as a summary of the type of losses covered—*i.e.*, losses suffered as a proximate result of the offense.

The victim says that if Congress had wanted to limit the losses recoverable under §2259 to those proximately caused by the offense, it could have written the statute the same way it wrote §2327, which provides for restitution to victims of telemarketing fraud. Section 2327, which is written and structured much like §2259, simply defines the term "full amount of the victim's losses" as "all losses suffered by the victim as a proximate result of the offense." §2327(b)(3). In essence the victim argues that the first five categories of losses enumerated in §2259(b)(3) would be superfluous if all were governed by a proximate-cause requirement. That, however, is unpersuasive. The first five categories provide guidance to district courts as to the specific types of losses Congress thought would often be the proximate result of a Chapter 110 offense and could as a general matter be included in an award of restitution.

Reading the statute to impose a general proximate-cause limitation accords with common sense. As noted above, proximate cause forecloses liability in situations where the causal link between conduct and result is so attenuated that the so-called consequence is more akin to mere fortuity. For example, suppose the traumatized victim of a Chapter 110 offender needed therapy and had a car accident on the way to her therapist's office. The resulting medical costs, in a literal sense, would be a factual result of the offense. But it would be strange indeed to make a defendant pay restitution for these costs. The victim herself concedes Congress did not intend costs like these to be recoverable under §2259. Brief for Respondent Amy 45. But she claims that it is unnecessary to

"read . . . into" §2259 a proximate-cause limitation in order to exclude costs of that sort. *Ibid.* She says the statute "contextually and inferentially require[s] a nexus for why" the losses were sustained—*i.e.*, a sufficient connection to child pornography. *Id.*, at 46.

The victim may be right that the concept of proximate cause is not necessary to impose sensible limitations on restitution for remote consequences. But one very effective way, and perhaps the most obvious way, of excluding costs like those arising from the hypothetical car accident described above would be to incorporate a proximate-cause limitation into the statute. Congress did so, and for reasons given above the proximate-cause requirement applies to all the losses described in §2259. Restitution is therefore proper under §2259 only to the extent the defendant's offense proximately caused a victim's losses.

## III

There remains the difficult question of how to apply the statute's causation requirements in this case. The problem stems from the somewhat atypical causal process underlying the losses the victim claims here. It is perhaps simple enough for the victim to prove the aggregate losses, including the costs of psychiatric treatment and lost income, that stem from the ongoing traffic in her images as a whole. (Complications may arise in disaggregating losses sustained as a result of the initial physical abuse, but those questions may be set aside for present purposes.) These losses may be called, for convenience's sake, a victim's "general losses." The difficulty is in determining the "full amount" of those general losses, if any, that are the proximate result of the offense conduct of a particular defendant who is one of thousands who have possessed and will in the future possess the victim's images but who has no other connection to the victim.

In determining the amount of general losses a defendant

must pay under §2259 the ultimate question is how much of these losses were the "proximate result," §2259(b)(3)(F), of that individual's offense. But the most difficult aspect of this inquiry concerns the threshold requirement of causation in fact. To be sure, the requirement of proximate causation, as distinct from mere causation in fact, would prevent holding any possessor liable for losses caused in only a remote sense. But the victim's costs of treatment and lost income resulting from the trauma of knowing that images of her abuse are being viewed over and over are direct and foreseeable results of child-pornography crimes, including possession, assuming the prerequisite of factual causation is satisfied. The primary problem, then, is the proper standard of causation in fact.

A

The traditional way to prove that one event was a factual cause of another is to show that the latter would not have occurred "but for" the former. This approach is a familiar part of our legal tradition, see 1 LaFave §6.4(b), at 467–468; Prosser and Keeton §41, at 266, and no party disputes that a showing of but-for causation would satisfy §2259's factual-causation requirement. Sometimes that showing could be made with little difficulty. For example, but-for causation could be shown with ease in many cases involving producers of child pornography, see §2251(a); parents who permit their children to be used for child-pornography production, see §2251(b); individuals who sell children for such purposes, see §2251A; or the initial distributor of the pornographic images of a child, see §2252.

In this case, however, a showing of but-for causation cannot be made. The District Court found that the Government failed to prove specific losses caused by Paroline in a but-for sense and recognized that it would be "incredibly difficult" to do so in a case like this. 672 F. Supp. 2d,

at 791–793. That finding has a solid foundation in the
record, and it is all but unchallenged in this Court. See
Brief for Respondent Amy 63; Brief for United States 19,
25. But see Supp. Brief for United States 8–10. From the
victim's perspective, Paroline was just one of thousands of
anonymous possessors. To be sure, the victim's precise
degree of trauma likely bears a relation to the total num-
ber of offenders; it would probably be less if only 10 rather
than thousands had seen her images. But it is not possi-
ble to prove that her losses would be less (and by how
much) but for one possessor's individual role in the large,
loosely connected network through which her images
circulate. See Sentencing Comm'n Report, at ii, xx. Even
without Paroline's offense, thousands would have viewed
and would in the future view the victim's images, so it
cannot be shown that her trauma and attendant losses
would have been any different but for Paroline's offense.
That is especially so given the parties' stipulation that the
victim had no knowledge of Paroline. See *supra*, at 4.

Recognizing that losses cannot be substantiated under a
but-for approach where the defendant is an anonymous
possessor of images in wide circulation on the Internet,
the victim and the Government urge the Court to read
§2259 to require a less restrictive causation standard, at
least in this and similar child-pornography cases. They
are correct to note that courts have departed from the but-
for standard where circumstances warrant, especially
where the combined conduct of multiple wrongdoers pro-
duces a bad outcome. See *Burrage*, 571 U. S., at ___ (slip
op., at 10) (acknowledging "the undoubted reality that
courts have not *always* required strict but-for causality,
even where criminal liability is at issue").

The victim and the Government look to the literature on
criminal and tort law for alternatives to the but-for test.
The Court has noted that the "most common" exception to
the but-for causation requirement is applied where "mul-

tiple sufficient causes independently . . . produce a result," *ibid.*; see also 1 LaFave §6.4(b), at 467–469; 1 Restatement §27, at 376. This exception is an ill fit here, as all parties seem to recognize. Paroline's possession of two images of the victim was surely not sufficient to cause her entire losses from the ongoing trade in her images. Nor is there a practical way to isolate some subset of the victim's general losses that Paroline's conduct alone would have been sufficient to cause. See Brief for United States 26, n. 11.

Understandably, the victim and the Government thus concentrate on a handful of less demanding causation tests endorsed by authorities on tort law. One prominent treatise suggests that "[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event." Prosser and Keeton §41, at 268. The Restatement adopts a similar exception for "[m]ultiple sufficient causal sets." 1 Restatement §27, Comment *f*, at 380–381. This is where a wrongdoer's conduct, though alone "insufficient . . . to cause the plaintiff's harm," is, "when combined with conduct by other persons," "more than sufficient to cause the harm." *Ibid.* The Restatement offers as an example a case in which three people independently but simultaneously lean on a car, creating enough combined force to roll it off a cliff. *Ibid.* Even if each exerted too little force to move the car, and the force exerted by any two was sufficient to the move the car, each individual is a factual cause of the car's destruction. *Ibid.* The Government argues that these authorities "provide ample support for an 'aggregate' causation theory," Brief for United States 18, and that such a theory would best effectuate congressional intent in cases like this, *id.*, at 18–19. The victim says much the same. Brief for Respondent Amy 42–43.

These alternative causal tests are a kind of legal fiction or construct. If the conduct of a wrongdoer is neither necessary nor sufficient to produce an outcome, that conduct cannot in a strict sense be said to have caused the outcome. Nonetheless, tort law teaches that alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes. It would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm. And it would be nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many (and thus in many instances hurt more badly than otherwise) would have no redress, whereas individuals hurt by the acts of one person alone would have a remedy. Those are the principles that underlie the various aggregate causation tests the victim and the Government cite, and they are sound principles.

These alternative causal standards, though salutary when applied in a judicious manner, also can be taken too far. That is illustrated by the victim's suggested approach to applying §2259 in cases like this. The victim says that under the strict logic of these alternative causal tests, each possessor of her images is a part of a causal set sufficient to produce her ongoing trauma, so each possessor should be treated as a cause in fact of all the trauma and all the attendant losses incurred as a result of the entire ongoing traffic in her images. *Id.*, at 43. And she argues that if this premise is accepted the further requirement of proximate causation poses no barrier, for she seeks restitution only for those losses that are the direct and foreseeable result of child-pornography offenses. Because the statute requires restitution for the "full amount of the victim's losses," including "any . . . losses suffered by the victim as a proximate result of the offense," §2259(b), she argues that restitution is required for the entire aggre-

gately caused amount.

The striking outcome of this reasoning—that each possessor of the victim's images would bear the consequences of the acts of the many thousands who possessed those images—illustrates why the Court has been reluctant to adopt aggregate causation logic in an incautious manner, especially in interpreting criminal statutes where there is no language expressly suggesting Congress intended that approach. See *Burrage*, 571 U. S., at ___ (slip op., at 11–12). Even if one were to refer just to the law of torts, it would be a major step to say there is a sufficient causal link between the injury and the wrong so that all the victim's general losses were "suffered . . . as a proximate result of [Paroline's] offense," §2259(b)(3)(F).

And there is special reason not to do so in the context of criminal restitution. Aside from the manifest procedural differences between criminal sentencing and civil tort lawsuits, restitution serves purposes that differ from (though they overlap with) the purposes of tort law. See, *e.g., Kelly* v. *Robinson*, 479 U. S. 36, 49, n. 10 (1986) (noting that restitution is, *inter alia*, "an effective rehabilitative penalty"). Legal fictions developed in the law of torts cannot be imported into criminal restitution and applied to their utmost limits without due consideration of these differences.

Contrary to the victim's suggestion, this is not akin to a case in which a "gang of ruffians" collectively beats a person, or in which a woman is "gang raped by five men on one night or by five men on five sequential nights." Brief for Respondent Amy 55. First, this case does not involve a set of wrongdoers acting in concert, see Prosser and Keeton §52, at 346 (discussing full liability for a joint enterprise); for Paroline had no contact with the overwhelming majority of the offenders for whose actions the victim would hold him accountable. Second, adopting the victim's approach would make an individual possessor liable for

the combined consequences of the acts of not just 2, 5, or even 100 independently acting offenders; but instead, a number that may reach into the tens of thousands. See Brief for Respondent Amy 65.

It is unclear whether it could ever be sensible to embrace the fiction that this victim's entire losses were the "proximate result," §2259(b)(3)(F), of a single possessor's offense. Paroline's contribution to the causal process underlying the victim's losses was very minor, both compared to the combined acts of all other relevant offenders, and in comparison to the contributions of other individual offenders, particularly distributors (who may have caused hundreds or thousands of further viewings) and the initial producer of the child pornography. See 1 Restatement §36, and Comment *a*, at 597–598 (recognizing a rule excluding from liability individuals whose contribution to a causal set that factually caused the outcome "pales by comparison to the other contributions to that causal set"). But see *id.*, §27, Reporters' Note, Comment *i*, at 395 ("The conclusion that none of" two dozen small contributions to a sufficient causal set was a cause of the outcome "is obviously untenable"). Congress gave no indication that it intended its statute to be applied in the expansive manner the victim suggests, a manner contrary to the bedrock principle that restitution should reflect the consequences of the defendant's own conduct, see *Hughey*, 495 U. S., at 416, not the conduct of thousands of geographically and temporally distant offenders acting independently, and with whom the defendant had no contact.

The victim argues that holding each possessor liable for her entire losses would be fair and practical, in part because offenders may seek contribution from one another. Brief for Respondent Amy 58. If that were so, it might mitigate to some degree the concerns her approach presents. But there is scant authority for her contention that offenders convicted in different proceedings in different

jurisdictions and ordered to pay restitution to the same
victim may seek contribution from one another. There is
no general federal right to contribution. *Northwest Air-
lines, Inc.* v. *Transport Workers*, 451 U. S. 77, 96–97
(1981). Nor does the victim point to any clear statutory
basis for a right to contribution in these circumstances.
She thus suggests that this Court should imply a cause of
action. Brief for Respondent Amy 58. But that is a rare
step in any circumstance. See, *e.g.*, *Stoneridge Investment
Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U. S. 148,
164–165 (2008); *Musick, Peeler & Garrett* v. *Employers
Ins. of Wausau*, 508 U. S. 286, 291 (1993) (noting that this
Court's precedents "teach that the creation of new rights
ought to be left to legislatures, not courts"). And it would
do little to address the practical problems offenders would
face in seeking contribution in any event, see Brief for
United States 45–46, problems with which the victim fails
to grapple.

The reality is that the victim's suggested approach
would amount to holding each possessor of her images
liable for the conduct of thousands of other independently
acting possessors and distributors, with no legal or practi-
cal avenue for seeking contribution. That approach is so
severe it might raise questions under the Excessive Fines
Clause of the Eighth Amendment. To be sure, this Court
has said that "the Excessive Fines Clause was intended to
limit only those fines directly imposed by, and payable to,
the government." *Browning-Ferris Industries of Vt., Inc.*
v. *Kelco Disposal, Inc.*, 492 U. S. 257, 268 (1989). But
while restitution under §2259 is paid to a victim, it is
imposed by the Government "at the culmination of a crim-
inal proceeding and requires conviction of an underlying"
crime, *United States* v. *Bajakajian*, 524 U. S. 321, 328
(1998). Thus, despite the differences between restitution
and a traditional fine, restitution still implicates "the
prosecutorial powers of government," *Browning-Ferris*,

*supra,* at 275. The primary goal of restitution is remedial or compensatory, cf. *Bajakajian*, *supra,* at 329, but it also serves punitive purposes, see *Pasquantino* v. *United States*, 544 U. S. 349, 365 (2005) ("The purpose of awarding restitution" under 18 U. S. C. §3663A "is . . . to mete out appropriate criminal punishment"); *Kelly*, 479 U. S., at 49, n. 10. That may be "sufficient to bring [it] within the purview of the Excessive Fines Clause," *Bajakajian*, *supra*, at 329, n. 4. And there is a real question whether holding a single possessor liable for millions of dollars in losses collectively caused by thousands of independent actors might be excessive and disproportionate in these circumstances. These concerns offer further reason not to interpret the statute the way the victim suggests.

B

The contention that the victim's entire losses from the ongoing trade in her images were "suffered . . . as a proximate result" of Paroline's offense for purposes of §2259 must be rejected. But that does not mean the broader principles underlying the aggregate causation theories the Government and the victim cite are irrelevant to determining the proper outcome in cases like this. The cause of the victim's general losses is the trade in her images. And Paroline is a part of that cause, for he is one of those who viewed her images. While it is not possible to identify a discrete, readily definable incremental loss he caused, it is indisputable that he was a part of the overall phenomenon that caused her general losses. Just as it undermines the purposes of tort law to turn away plaintiffs harmed by several wrongdoers, it would undermine the remedial and penological purposes of §2259 to turn away victims in cases like this.

With respect to the statute's remedial purpose, there can be no question that it would produce anomalous results to say that no restitution is appropriate in these

circumstances. It is common ground that the victim suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured. Brief for Petitioner 50; Brief for Respondent Wright 4; Brief for United States 23; Brief for Respondent Amy 60. Harms of this sort are a major reason why child pornography is outlawed. See *Ferber*, 458 U. S., at 759. The unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse—including Paroline—plays a part in sustaining and aggravating this tragedy. And there can be no doubt Congress wanted victims to receive restitution for harms like this. The law makes restitution "mandatory," §2259(b)(4), for child-pornography offenses under Chapter 110, language that indicates Congress' clear intent that victims of child pornography be compensated by the perpetrators who contributed to their anguish. It would undermine this intent to apply the statute in a way that would render it a dead letter in child-pornography prosecutions of this type.

Denying restitution in cases like this would also be at odds with the penological purposes of §2259's mandatory restitution scheme. In a sense, every viewing of child pornography is a repetition of the victim's abuse. One reason to make restitution mandatory for crimes like this is to impress upon offenders that their conduct produces concrete and devastating harms for real, identifiable victims. See *Kelly*, *supra*, at 49, n. 10 ("Restitution is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused"). It would be inconsistent with this purpose to apply the statute in a way that leaves offenders with the mistaken impression that child-pornography possession (at least where the images are in wide circulation) is a victimless crime.

If the statute by its terms required a showing of strict but-for causation, these purposes would be beside the point. But the text of the statute is not so limited. Although Congress limited restitution to losses that are the "proximate result" of the defendant's offense, such unelaborated causal language by no means requires but-for causation by its terms. See *Burrage*, 571 U. S., at ___ (slip op., at 8) (courts need not read phrases like "results from" to require but-for causality where there is "textual or contextual" reason to conclude otherwise). As the authorities the Government and the victim cite show, the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated, cf. *id.*, at ___ (slip op., at 10). It would be unacceptable to adopt a causal standard so strict that it would undermine congressional intent where neither the plain text of the statute nor legal tradition demands such an approach.

In this special context, where it can be shown both that a defendant possessed a victim's images and that a victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying §2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses. The amount would not be severe in a case like this, given the nature of the causal connection between the conduct of a possessor like Paroline and the entirety of the victim's general losses from the trade in her images, which are the product of the acts of thousands of offenders. It would not, however, be a token or nominal amount. The required restitution would be a reasonable and circumscribed award imposed in recognition of the indisputable role of

the offender in the causal process underlying the victim's losses and suited to the relative size of that causal role. This would serve the twin goals of helping the victim achieve eventual restitution for all her child-pornography losses and impressing upon offenders the fact that child-pornography crimes, even simple possession, affect real victims.

There remains the question of how district courts should go about determining the proper amount of restitution. At a general level of abstraction, a court must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses. This cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment. But that is neither unusual nor novel, either in the wider context of criminal sentencing or in the more specific domain of restitution. It is well recognized that district courts by necessity "exercise . . . discretion in fashioning a restitution order." §3664(a). Indeed, a district court is expressly authorized to conduct a similar inquiry where multiple defendants who have "contributed to the loss of a victim" appear before it. §3664(h). In that case it may "apportion liability among the defendants to reflect the level of contribution to the victim's loss . . . of each defendant." *Ibid.* Assessing an individual defendant's role in the causal process behind a child-pornography victim's losses does not involve a substantially different or greater exercise of discretion.

There are a variety of factors district courts might consider in determining a proper amount of restitution, and it is neither necessary nor appropriate to prescribe a precise algorithm for determining the proper restitution amount at this point in the law's development. Doing so would unduly constrain the decisionmakers closest to the facts of any given case. But district courts might, as a starting

point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images (excluding, of course, any remote losses like the hypothetical car accident described above, see *supra*, at 10), then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses. These could include the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role. See Brief for United States 49.

These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense. The resulting amount fixed by the court would be deemed the amount of the victim's general losses that were the "proximate result of the offense" for purposes of §2259, and thus the "full amount" of such losses that should be awarded. The court could then set an appropriate payment schedule in consideration of the defendant's financial means. See §3664(f)(2).

The victim says this approach is untenable because her losses are "indivisible" in the sense that term is used by tort law, *i.e.*, that there is no "reasonable basis for the factfinder to determine . . . the amount of damages separately caused by" any one offender's conduct. Restatement

(Third) of Torts: Apportionment of Liability §26, p. 320 (1999). The premise of her argument is that because it is in a sense a fiction to say Paroline caused $1,000 in losses, $10,000 in losses, or any other lesser amount, it is necessary to embrace the much greater fiction that Paroline caused all the victim's losses from the ongoing trade in her images. But that is a non sequitur. The Court is required to define a causal standard that effects the statute's purposes, not to apply tort-law concepts in a mechanical way in the criminal restitution context. Even if the victim's losses are fully "indivisible" in this sense (which is debatable), treating Paroline as a proximate cause of all the victim's losses—especially in the absence of a workable system of contribution—stretches the fiction of aggregate causation to its breaking point. Treating him as a cause of a smaller amount of the victim's general losses, taking account of his role in the overall causal process behind those losses, effects the statute's purposes; avoids the nonsensical result of turning away victims emptyhanded; and does so without sacrificing the need for proportionality in sentencing.

The victim also argues that this approach would consign her to "piecemeal" restitution and leave her to face "decades of litigation that might never lead to full recovery," Brief for Respondent Amy 57, which "would convert Congress's promise to child pornography victims into an empty gesture," *id.*, at 66. But Congress has not promised victims full and swift restitution at all costs. To be sure, the statute states a strong restitutionary purpose; but that purpose cannot be twisted into a license to hold a defendant liable for an amount drastically out of proportion to his own individual causal relation to the victim's losses.

Furthermore, an approach of this sort better effects the need to impress upon defendants that their acts are not irrelevant or victimless. As the Government observes, Reply Brief for United States 18, it would undermine this

important purpose of criminal restitution if the victim simply collected her full losses from a handful of wealthy possessors and left the remainder to pay nothing because she had already fully collected. Of course the victim should someday collect restitution for all her child-pornography losses, but it makes sense to spread payment among a larger number of offenders in amounts more closely in proportion to their respective causal roles and their own circumstances so that more are made aware, through the concrete mechanism of restitution, of the impact of child-pornography possession on victims.

C

This approach is not without its difficulties. Restitution orders should represent "an application of law," not "a decisionmaker's caprice," *Philip Morris USA* v. *Williams*, 549 U. S. 346, 352 (2007) (internal quotation marks omitted), and the approach articulated above involves discretion and estimation. But courts can only do their best to apply the statute as written in a workable manner, faithful to the competing principles at stake: that victims should be compensated and that defendants should be held to account for the impact of their conduct on those victims, but also that defendants should be made liable for the consequences and gravity of their own conduct, not the conduct of others. District courts routinely exercise wide discretion both in sentencing as a general matter and more specifically in fashioning restitution orders. There is no reason to believe they cannot apply the causal standard defined above in a reasonable manner without further detailed guidance at this stage in the law's elaboration. Based on its experience in prior cases of this kind, the Government—which, as noted above, see *supra*, at 5–6, bears the burden of proving the amount of the victim's losses, §3664(e)—could also inform district courts of restitution sought and ordered in other cases.

Opinion of the Court

\*     \*     \*

The Fifth Circuit's interpretation of the requirements of §2259 was incorrect.  The District Court likewise erred in requiring a strict showing of but-for causation.  The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–8561

DOYLE RANDALL PAROLINE, PETITIONER *v.*
UNITED STATES, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 23, 2014]

CHIEF JUSTICE ROBERTS, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

I certainly agree with the Court that Amy deserves restitution, and that Congress—by making restitution mandatory for victims of child pornography—meant that she have it. Unfortunately, the restitution statute that Congress wrote for child pornography offenses makes it impossible to award that relief to Amy in this case. Instead of tailoring the statute to the unique harms caused by child pornography, Congress borrowed a generic restitution standard that makes restitution contingent on the Government's ability to prove, "by the preponderance of the evidence," "the amount of the loss sustained by a victim as a result of" the defendant's crime. 18 U. S. C. §3664(e). When it comes to Paroline's crime—possession of two of Amy's images—it is not possible to do anything more than pick an arbitrary number for that "amount." And arbitrary is not good enough for the criminal law.

The Court attempts to design a more coherent restitution system, focusing on "the defendant's relative role in the causal process that underlies the victim's general losses." *Ante,* at 21. But this inquiry, sensible as it may be, is not the one Congress adopted. After undertaking the inquiry that Congress *did* require, the District Court in this case concluded that the Government could not meet

its statutory burden of proof.  Before this Court, the Gov-
ernment all but concedes the point.  See Brief for United
States 25 ("it is practically impossible to know whether
[Amy's] losses would have been slightly lower if one were
to subtract one defendant, or ten, or fifty").  I must regret-
fully dissent.

I

Section 2259(a) of Title 18 directs that a district court
"shall order restitution for any offense under this chapter,"
which includes Paroline's offense of knowingly possessing
child pornography in violation of section 2252.  In case
Congress's purpose were not clear from its use of "shall,"
section 2259(b)(4) then emphasizes that "[t]he issuance of
a restitution order under this section is mandatory."

Section 2259(b)(1) spells out who may receive restitu-
tion, and for what.  It provides that "[t]he order of restitu-
tion under this section shall direct the defendant to pay
the victim (through the appropriate court mechanism) the
full amount of the victim's losses as determined by the
court pursuant to [section 2259(b)(2)]."  The term " 'vic-
tim' " is defined as "the individual harmed as a result of a
commission of a crime under this chapter."  §2259(c).  And
the term "'full amount of the victim's losses' includes any
costs incurred by the victim for . . . medical services relat-
ing to physical, psychiatric, or psychological care"; "lost
income"; and "any other losses suffered by the victim as a
proximate result of the offense."  §§2259(b)(3)(A), (D), (F).

Section 2259(b)(2) then describes *how* the district court
must calculate restitution.  It provides that "[a]n order of
restitution under this section shall be issued and enforced
in accordance with section 3664 in the same manner as an
order under section 3663A."  Unlike section 2259, sections
3663A and 3664 were not designed specifically for child
pornography offenses; they are part of the Mandatory
Victims Restitution Act of 1996 and supply general resti-

tution guidelines for many federal offenses. Most relevant here, section 3664(e) provides that "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."

## A

As the Court explains, the statute allows restitution only for those losses that were the "proximate result" of Paroline's offense. See *ante,* at 9–11 (citing §2259(b)(3)). Contrary to Paroline's argument, the proximate cause requirement is easily satisfied in this case. It was readily foreseeable that Paroline's crime could cause Amy to suffer precisely the types of losses that she claims: future lost wages, costs for treatment and counseling, and attorney's fees and costs, all of which are eligible losses enumerated in section 2259(b)(3). There is a "direct relation" between those types of injuries and Paroline's "injurious conduct." *Holmes* v. *Securities Investor Protection Corporation*, 503 U. S. 258, 268 (1992). I therefore agree with the Court that if Paroline *actually* caused those losses, he also *proximately* caused them. See *ante,* at 12.

The more pressing problem is the statutory requirement of actual causation. See *Burrage* v. *United States*, 571 U. S. ___, ___ (2014) (slip op., at 6) (the ordinary meaning of the term "results from" requires proof that the defendant's conduct was the "actual cause" of the injury). Here too the Court correctly holds that the statute precludes the restitution award sought by Amy and preferred by JUSTICE SOTOMAYOR's dissent, which would hold Paroline responsible for Amy's *entire* loss. See *ante,* at 16–19; contra, *post,* at 7–16. Congress has authorized restitution only for "the amount of the loss sustained by a victim as a result of the offense." §3664(e). We have interpreted

virtually identical language, in the predecessor statute to section 3664, to require "restitution to be tied to the loss caused *by the offense of conviction.*" *Hughey* v. *United States*, 495 U. S. 411, 418 (1990) (citing 18 U. S. C. §3580(a) (1982 ed.); emphasis added). That is, restitution may not be imposed for losses caused by any other crime or any other defendant.[1]

JUSTICE SOTOMAYOR's dissent dismisses section 3664(e), which is Congress's direct answer to the very question presented by this case, namely, how to resolve a "dispute as to the proper amount . . . of restitution." JUSTICE SOTOMAYOR thinks the answer to that question begins and ends with the statement in section 2259(b)(1) that the defendant must pay "the full amount of the victim's losses." See *post*, at 1, 2, 10, 15. But losses from what? The answer is found in the rest of that sentence: "the full amount of the victim's losses *as determined by the court pursuant to paragraph 2.*" §2259(b)(1) (emphasis added). "[P]aragraph 2," of course, instructs that "[a]n order of restitution under this section shall be issued and enforced in accordance with section 3664 in the same manner as an order under section 3663A." §2259(b)(2). And it is section 3664 that provides the statute's burden of proof and specifies that the defendant pay for those losses sustained "as a result of *the* offense"—that is, his offense. §3664(e).

The offense of conviction here was Paroline's possession of two of Amy's images. No one suggests Paroline's crime

_____

[1] In a case "where the loss is the product of the combined conduct of multiple offenders," *post,* at 7 (SOTOMAYOR, J., dissenting), section 3664(h) provides that a court may "make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." As the Court notes, however, this provision applies only when multiple defendants are sentenced in the same proceeding, or charged under the same indictment. *Ante,* at 22; see also Brief for United States 43.

actually caused Amy to suffer millions of dollars in losses, so the statute does not allow a court to award millions of dollars in restitution. Determining what amount the statute does allow—the amount of Amy's losses that Paroline's offense caused—is the real difficulty of this case. See *ante,* at 12.

## B

Regrettably, Congress provided no mechanism for answering that question. If actual causation is to be determined using the traditional, but-for standard, then the Court acknowledges that "a showing of but-for causation cannot be made" in this case. *Ante,* at 12. Amy would have incurred all of her lost wages and counseling costs even if Paroline had not viewed her images. The Government and Amy respond by offering an "aggregate" causation theory borrowed from tort law. But even if we apply this "legal fiction," *ante,* at 15, and assume, for purposes of argument, that Paroline's crime contributed something to Amy's total losses, that suffices only to establish causation in fact. It is not sufficient to award restitution under the statute, which requires a further determination of the *amount* that Paroline must pay. He must pay "the full amount of the victim's losses," yes, but "as determined by" section 3664—that is, the full amount of the losses *he* caused. The Government has the burden to establish *that* amount, and no one has suggested a plausible means for the Government to carry that burden.[2]

The problem stems from the nature of Amy's injury. As explained, section 3664 is a general statute designed to provide restitution for more common crimes, such as fraud and assault. The section 3664(e) standard will work just

---

[2] The correct amount is not the one favored by JUSTICE SOTOMAYOR's dissent, which would hold Paroline liable for losses that he certainly *did not* cause, without any right to seek contribution from others who harmed Amy.

fine for most crime victims, because it will usually not be difficult to identify the harm caused by the defendant's offense. The dispute will usually just be over the amount of the victim's loss—for example, the value of lost assets or the cost of a night in the hospital.

Amy has a qualitatively different injury. Her loss, while undoubtedly genuine, is a result of the collective actions of a huge number of people—beginning with her uncle who abused her and put her images on the Internet, to the distributors who make those images more widely available, to the possessors such as Paroline who view her images. The harm to Amy was produced over time, gradually, by tens of thousands of persons acting independently from one another.[3] She suffers in particular from her knowledge that her images are being viewed online by an unknown number of people, and from her fear that any person she meets might recognize her from having witnessed her abuse. App. 59–66. But Amy does not know who Paroline is. *Id.,* at 295, n. 11. Nothing in the record comes close to establishing that Amy would have suffered less if Paroline had not possessed her images, let alone how much less. See Brief for United States 25. Amy's injury is indivisible, which means that Paroline's particular share of her losses is unknowable. And yet it is proof of Paroline's particular share that the statute requires.

By simply importing the generic restitution statute without accounting for the diffuse harm suffered by victims of child pornography, Congress set up a restitution system sure to fail in cases like this one. Perhaps a case with different facts, say, a single distributor and only a

---

[3] The gang assaults discussed by JUSTICE SOTOMAYOR, *post,* at 8, are not a fair analogy. The gang members in those cases acted together, with a common plan, each one aiding and abetting the others in inflicting harm. But Paroline has never met or interacted with any, or virtually any, of the other persons who contributed to Amy's injury, and his possession offense did not aid or abet anyone.

handful of possessors, would be susceptible of the proof the statute requires. But when tens of thousands of copies (or more) of Amy's images have changed hands all across the world for more than a decade, a demand for the Government to prove "the amount of the loss sustained by a victim as a result of *the* offense"—the offense before the court in any particular case—is a demand for the impossible. §3664(e) (emphasis added). When Congress conditioned restitution on the Government's meeting that burden of proof, it effectively precluded restitution in most cases involving possession or distribution of child pornography.

## II

The District Court in Paroline's case found that the Government could not meet its statutory burden of proof. The Government does not really contest that holding here; it instead asks to be held to a less demanding standard. Having litigated this issue for years now in virtually every Circuit, the best the Government has come up with is to tell courts awarding restitution to look at what other courts have done. But that is not a workable guide, not least because courts have taken vastly different approaches to materially indistinguishable cases. According to the Government's lodging in this case, District Courts awarding less than Amy's full losses have imposed restitution orders varying from $50 to $530,000.[4] Restitution Awards for Amy Through December 11, 2013, Lodging of United States. How is a court supposed to use those figures as any sort of guidance? Pick the median figure? The mean? Something else?

More to the point, the Government's submission lacks any basis in law. That the first district courts confronted

---

[4] Amy's uncle—the initial source of *all* of her injuries—was ordered to pay $6,325 in restitution, which only underscores how arbitrary the statute is when applied to most child pornography offenses.

with Amy's case awarded $1,000, or $5,000, or $530,000, for no articulable reason, is not a legal basis for awarding one of those figures in Paroline's case. The statute requires proof of *this defendant's* harm done, not the going rate. And of course, as the Government acknowledges, its approach "doesn't work very well" in the first case brought by a particular victim. Tr. of Oral Arg. 24.

The majority's proposal is to have a district court "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Ante,* at 22. Even if that were a plausible way to design a restitution system for Amy's complex injury, there is no way around the fact that it is not the system that Congress created. The statute requires restitution to be based exclusively on *the losses that resulted from the defendant's crime*—not on the defendant's relative culpability. The majority's plan to situate Paroline along a spectrum of offenders who have contributed to Amy's harm will not assist a district court in calculating *the amount* of Amy's losses—the amount of her lost wages and counseling costs—that was caused by Paroline's crime (or that of any other defendant).

The Court is correct, of course, that awarding Amy no restitution would be contrary to Congress's remedial and penological purposes. See *ante,* at 20. But we have previously refused to allow "policy considerations"—including an "expansive declaration of purpose," and the need to "compensate victims for the full losses they suffered"—to deter us from reading virtually identical statutory language to require proof of the harm caused solely by the defendant's particular offense. *Hughey*, 495 U. S., at 420–421.

Moreover, even the Court's "relative role in the causal process" approach to the statute, *ante,* at 21, is unlikely to make Amy whole. To the extent that district courts do

form a sort of consensus on how much to award, experience shows that the amount in any particular case will be quite small—the significant majority of defendants have been ordered to pay Amy $5,000 or less. Lodging of United States. This means that Amy will be stuck litigating for years to come. The Court acknowledges that Amy may end up with "piecemeal" restitution, yet responds simply that "Congress has not promised victims full and swift restitution at all costs." *Ante,* at 24.

Amy will fare no better if district courts consider the other factors suggested by the majority, including the number of defendants convicted of possessing Amy's images, a rough estimate of those likely to be convicted in the future, and an even rougher estimate of the total number of persons involved in her harm. *Ante,* at 23. In the first place, only the last figure is relevant, because Paroline's relative significance can logically be measured only in light of everyone who contributed to Amy's injury—not just those who have been, or will be, caught and convicted. Even worse, to the extent it is possible to project the total number of persons who have viewed Amy's images, that number is tragically large, which means that restitution awards tied to it will lead to a pitiful recovery in every case. See Brief for Respondent Amy 65 (estimating Paroline's "'market share'" of Amy's harm at 1/71,000, or $47). The majority says that courts should not impose "trivial restitution orders," *ante,* at 23, but it is hard to see how a court fairly assessing this defendant's relative contribution could do anything else.

Nor can confidence in judicial discretion save the statute from arbitrary application. See *ante,* at 22, 25–26. It is true that district courts exercise substantial discretion in awarding restitution and imposing sentences in general. But they do not do so by mere instinct. Courts are instead guided by statutory standards: in the restitution context, a fair determination of the losses caused by the individual

defendant under section 3664(e); in sentencing more generally, the detailed factors in section 3553(a). A contrary approach—one that asks district judges to impose restitution or other criminal punishment guided solely by their own intuitions regarding comparative fault—would undermine the requirement that every criminal defendant receive due process of law.

\* \* \*

The Court's decision today means that Amy will not go home with nothing. But it would be a mistake for that salutary outcome to lead readers to conclude that Amy has prevailed or that Congress has done justice for victims of child pornography. The statute as written allows no recovery; we ought to say so, and give Congress a chance to fix it.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–8561

_____

## DOYLE RANDALL PAROLINE, PETITIONER *v.* UNITED STATES, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 23, 2014]

JUSTICE SOTOMAYOR, dissenting.

This Court has long recognized the grave "physiological, emotional, and mental" injuries suffered by victims of child pornography. *New York* v. *Ferber*, 458 U. S. 747, 758 (1982). The traffic in images depicting a child's sexual abuse, we have observed, "'poses an even greater threat to the child victim than does sexual abuse or prostitution'" because the victim must "'go through life knowing that the recording is circulating within the mass distribution system for child pornography.'" *Id.*, at 759, n. 10. As we emphasized in a later case, the images cause "continuing harm by haunting the chil[d] in years to come." *Osborne* v. *Ohio*, 495 U. S. 103, 111 (1990).

Congress enacted 18 U. S. C. §2259 against this backdrop. The statute imposes a "mandatory" duty on courts to order restitution to victims of federal offenses involving the sexual abuse of children, including the possession of child pornography. §2259(b)(4). And it commands that for any such offense, a court "shall direct the defendant to pay the victim . . . the full amount of the victim's losses." §2259(b)(1).

The Court interprets this statute to require restitution in a "circumscribed" amount less than the "entirety of the victim's . . . losses," a total it instructs courts to estimate based on the defendant's "relative role" in the victim's

harm. *Ante*, at 21. That amount, the Court holds, should be neither "nominal" nor "severe." *Ibid.*

I appreciate the Court's effort to achieve what it perceives to be a just result. It declines to require restitution for a victim's full losses, a result that might seem incongruent to an individual possessor's partial role in a harm in which countless others have participated. And it rejects the position advanced by Paroline and the dissenting opinion of THE CHIEF JUSTICE, which would result in no restitution in cases like this for the perverse reason that a child has been victimized by too many.

The Court's approach, however, cannot be reconciled with the law that Congress enacted. Congress mandated restitution for the "full amount of the victim's losses," §2259(b)(1), and did so within the framework of settled tort law principles that treat defendants like Paroline jointly and severally liable for the indivisible consequences of their intentional, concerted conduct. And to the extent an award for the full amount of a victim's losses may lead to fears of unfair treatment for particular defendants, Congress provided a mechanism to accommodate those concerns: Courts are to order "partial payments" on a periodic schedule if the defendant's financial circumstances or other "interest[s] of justice" so require. §§3664(f)(3), 3572(d)(1). I would accordingly affirm the Fifth Circuit's holding that the District Court "must enter a restitution order reflecting the 'full amount of [Amy's] losses,'" *In re Amy Unknown*, 701 F. 3d 749, 774 (2012), and instruct the court to consider a periodic payment schedule on remand.

## I
## A

There are two distinct but related questions in this case: First, whether Paroline's conduct bears a sufficient causal nexus to Amy's harm, and second, if such a nexus exists, how much restitution Paroline should be required to pay.

Beginning with causation, I agree with the majority that proximate causation is beyond dispute because the medical and economic losses suffered by Amy are "direct and foreseeable results of child-pornography crimes." *Ante,* at 12; accord, *ante*, at 3 (ROBERTS, C. J., dissenting). The real issue, then, is "the proper standard of causation in fact." *Ante,* at 12 (majority opinion).

The majority and I share common ground on much of this issue. We agree that the ordinary way to prove cause-in-fact is to show that a result would not have occurred "but for" the defendant's conduct. *Burrage* v. *United States*, 571 U. S. ___, ___ (2014) (slip op., at 6). We also agree that "'strict but-for causality'" is "'not *always* required,'" and that alternative standards of factual causation are appropriate "where there is 'textual or contextual' reason to conclude" as much. *Ante,* at 13, 21 (quoting *Burrage*, 571 U. S., at ___ (slip op., at 8, 10). And most importantly, we agree that there are ample reasons to reject a strict but-for causality requirement in §2259. See *ante,* at 21.

Starting with the text, §2259 declares that a court "shall order restitution for any offense under this chapter." The possession of child pornography, §2252, is an offense under the relevant chapter, and the term "shall" creates "an obligation impervious to judicial discretion," *Lexecon Inc.* v. *Milberg Weiss Bershad Hynes & Lerach*, 523 U. S. 26, 35 (1998). So the text could not be clearer: A court must order restitution against a person convicted of possessing child pornography. Section 2259(b)(4) underscores this directive by declaring that "[t]he issuance of a restitution order under this section is mandatory." And the statute's title—"mandatory restitution"—reinforces it further still.

Interpreting §2259 to require but-for causality would flout these simple textual commands. That is because "a showing of but-for causation cannot be made" in this case

and many like it. *Ante,* at 12. Even without Paroline's offense, it is a regrettable fact that "thousands would have viewed and would in the future view [Amy's] images," such that "it cannot be shown that her trauma and attendant losses would have been any different but for Parolin[e]." *Id.,* at 13. A but-for requirement would thus make restitution under §2259 the opposite of "mandatory"; it would preclude restitution to the victim of the typical child pornography offense for the nonsensical reason that the child has been victimized by too many.

Such an approach would transform §2259 into something unrecognizable to the Congress that wrote it. When Congress passed §2259 in 1994, it was common knowledge that child pornography victims suffer harm at the hands of numerous offenders who possess their images in common, whether in print, film, or electronic form. See, *e.g.*, Shouvlin, Preventing the Sexual Exploitation of Children: A Model Act, 17 Wake Forest L. Rev. 535, 544 (1981) (describing the "enormous number of magazines" and "hundreds of films" produced each year depicting the sexual abuse of children, which were circulated to untold numbers of offenders through a "well-organized distribution system [that] ensures that even the small towns have access to [the] material"); Doyle, FBI Probing Child Porn on Computers, San Francisco Chronicle, Dec. 5, 1991, p. A23 (describing complaint that "child pornographic photographs" were circulating via the "America On-Line computer service"). Congress was also acutely aware of the severe injuries that victims of child pornography suffer at the hands of criminals who possess and view the recorded images of their sexual abuse. Congress found, for example, that the "continued existence" and circulation of child pornography images "causes the child victims of sexual abuse continuing harm by haunting those children in future years." Child Pornography Prevention Act of 1996, §121, 110 Stat. 3009–26, Congressional Findings (2), notes

following 18 U. S. C. §2251 (hereinafter §2251 Findings). It is inconceivable that Congress would have imposed a mandatory restitution obligation on the possessors who contribute to these "continuing harm[s]," *ibid.,* only to direct courts to apply a but-for cause requirement that would prevent victims from actually obtaining any recovery.

There is, of course, an alternative standard for determining cause-in-fact that would be consistent with the text of §2259 and the context in which it was enacted: aggregate causation. As the majority points out, aggregate causation was, "no less than the but-for test itself," a "part of the background legal tradition against which Congress" legislated. *Ante,* at 21. And under this standard, "'[w]hen the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause in fact of the event.'" *Ante,* at 14 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts §41, p. 268 (5th ed. 1984) (hereinafter Prosser and Keeton)).[1] Paroline and his fellow offenders plainly qualify as factual causes under this approach because Amy's losses would not have occurred but for their combined conduct, and because applying the but-for rule would excuse them all.

There is every reason to think Congress intended §2259

_____

[1] The Fifth Circuit recognized this standard more than 60 years ago when it observed that "'[a]ccording to the great weight of authority where the concurrent or successive acts or omissions of two or more persons, although acting independently of each other, are in combination, the direct or proximate cause of a single injury,'" any of them may be held liable "'even though his act alone might not have caused the entire injury, or the same damage might have resulted from the act of the other tort-feasor[s].'" *Phillips Petroleum Co.* v. *Hardee*, 189 F. 2d 205, 212 (1951) (quoting 38 Am. Jur. Negligence §257, p. 946 (1941)).

to incorporate aggregate causation. Whereas a but-for requirement would set §2259's "mandatory" restitution command on a collision course with itself, the aggregate causation standard follows directly from the statute. Section 2259 is unequivocal; it offers no safety-in-numbers exception for defendants who possess images of a child's abuse in common with other offenders. And the aggregate causation standard exists to avoid exactly that kind of exception. See Prosser and Keeton §41, at 268–269 (aggregate causation applies where multiple defendants "bea[r] a like relationship" to a victim's injury, and where "[e]ach seeks to escape liability for a reason that, if recognized, would likewise protect each other defendant in the group, thus leaving the [victim] without a remedy in the face of the fact that had none of them acted improperly the [victim] would not have suffered the harm"); Restatement (Third) of Torts: Liability for Physical and Emotional Harm §27, Comment *f*, p. 380 (2005) (similar).

At bottom, Congress did not intend §2259 to create a safe harbor for those who inflict upon their victims the proverbial death by a thousand cuts. Given the very nature of the child pornography market—in which a large class of offenders contribute jointly to their victims' harm by trading in their images—a but-for causation requirement would swallow §2259's "mandatory" restitution command, leaving victims with little hope of recovery. That is all the "textual [and] contextual" reason necessary to conclude that Congress incorporated aggregate causation into §2259. *Burrage*, 571 U. S., at ___ (slip op., at 8).

## B

The dissent of THE CHIEF JUSTICE suggests that a contrary conclusion is compelled by our decision in *Hughey* v. *United States*, 495 U. S. 411 (1990). *Hughey* involved a defendant who had been convicted of a single count of unauthorized credit card use, which resulted in $10,412 in

losses. *Id*., at 414. The Government nonetheless requested restitution for additional losses based on different counts in the indictment that the Government had agreed to dismiss. *Id*., at 413. We declined the Government's request, reasoning that restitution was to be tied to the offense of conviction. *Id.,* at 418.

That commonsense holding, of course, casts no doubt on the ordinary practice of requiring restitution for losses caused by an offense for which a defendant *is* convicted, where the loss is the product of the combined conduct of multiple offenders. What troubles my colleagues in this case, then, is not the concept of restitution in cases involving losses caused by more than one offender. Their objection is instead to restitution in cases where the victim's losses are caused by *too many* offenders. As THE CHIEF JUSTICE puts it, Congress wrote a law that would enable Amy to recover if only her images had been circulated by "a single distributor" to just a "handful of possessors." *Ante,* at 6–7. But because she has been victimized by numerous distributors and thousands of possessors, she gets nothing. It goes without saying that Congress did not intend that result.

My colleagues in dissent next assert that no restitution may be awarded because of §3664(e), which describes the Government's burden of showing the "loss sustained by a victim as a result of the offense." But that provision is nothing close to a "direct answer" to this case. *Ante*, at 4. It simply restates the question: What should a court do when the losses sustained by a victim *are* the "result of the [defendant's] offense," §3664(e), but that result is produced in combination with the offenses of others? One answer is that the defendant's offense is a cause-in-fact only of losses for which it was a but-for cause. A second is that the offense is a cause-in-fact of losses for which it was part of the aggregate cause. The former would preclude restitution in cases like this; the latter would allow it. Given

Congress' "mandatory" command that courts "shall order restitution for any offense," §§2259(a), (b)(4), it is beyond clear which answer Congress chose.[2]

THE CHIEF JUSTICE's dissent also fails to contend with the ramifications of the suggestion that §3664(e) forecloses entry of restitution in cases where a victim suffers indivisible losses as a result of the aggregate conduct of numerous offenders. It claims that this reading of §3664(e) "will work just fine" for "common crimes" such as assault. *Ante*, at 5–6. But what about a victim of a vicious gang assault, where a single offender's conduct cannot be labeled a but-for cause of any discrete injury? Such offenses are, unfortunately, all too common. See, *e.g., Wheelock* v. *United States*, 2013 WL 2318145, \*2 (ED Wisc., May 28, 2013) (defendant convicted for his participation in a gang rape of a 13-year-old victim in which he "and several other individuals had provided alcohol to the girl and, after she became intoxicated and unconscious, sexually assaulted her"); *United States* v. *Homer B.*, 1990 WL 79705 (CA9, June 14, 1990) (similar). I would have thought it beyond refute that the victim of such a tragic offense would be entitled to restitution even though none of her losses may be attributed solely to any individual defendant. If the opinion of THE CHIEF JUSTICE is in agreement, it does not explain why the result should be any different for victims like Amy, who have suffered heart wrenching losses at the

---

[2] THE CHIEF JUSTICE's dissent elides the distinction between aggregate and but-for causation. Despite "assum[ing], for purposes of argument," that §2259 incorporates aggregate causation, the dissent nevertheless applies but-for causation to determine the "full amount" of losses Paroline must pay. See *ante*, at 5, and n. 2 (arguing that Paroline can only be asked to pay "the full amount of the losses *he* caused," not losses that he and others combined to cause). My dissenting colleagues cannot have it both ways. Either §2259 incorporates aggregate causation (in which case the full amount of Amy's losses is all of the losses aggregately caused by Paroline and like offenders), or it requires but-for causation (in which case Amy gets nothing).

hands of thousands of offenders rather than a few.[3]

## II

The majority accepts aggregate causation at least to an extent, ruling that §2259 requires possessors to pay some amount of restitution even though "it is impossible" to say that they caused "a particular amount of [a victim's] losses . . . by recourse to a more traditional [but-for] causal inquiry." *Ante*, at 21. But the majority resists the "strict logic" of aggregate causation for fear that doing so would produce the "striking outcome" of an award against an individual possessor "for the entire aggregately caused amount." *Ante,* at 15–16. The majority accordingly holds that "a court applying §2259 should order restitution in an amount that comports with the defendant's relative" contribution to "the victim's general losses." *Ante*, at 21.

The majority's apportionment approach appears to be a sensible one. It would, for instance, further the goal of "proportionality in sentencing," avoid "turning away victims emptyhanded," and "spread payment among" offenders. *Ante,* at 24–25. But it suffers from a far more fundamental problem: It contravenes the language Congress actually used. Section 2259 directs courts to enter restitution not for a "proportional" or "relative" amount, but for

_____

[3] THE CHIEF JUSTICE objects that gang assaults are not a "fair analogy" because they involve a group of individuals acting "together, with a common plan." *Ante*, at 6, n. 3. But individuals need not act together to trigger joint and several liability; such liability applies equally to multiple actors who independently commit intentional torts that combine to produce an indivisible injury. *Infra*, at 11–14. And in any event, the offenders at issue in this case *do* act together, with the common end of trafficking in the market for images of child sexual abuse. See *infra*, at 12–13. While these offenders may not be physically in the same room when they commit their crimes, there is no reason to read §2259(b)(4)'s "mandatory" restitution command out of the statute for child abusers who hide behind the anonymity of a computer screen.

the "full amount of the victim's losses." §2259(b)(1). That command is unequivocal, and it is buttressed by the tort law tradition of joint and several liability within which Congress legislated.

## A

Once a defendant is found to bear a sufficient causal nexus to a victim's harm, §2259 provides a straightforward instruction on how much restitution a court is to order: "The order of restitution under this section shall direct the defendant to pay the victim . . . the full amount of the victim's losses." §2259(b)(1). Because the word "shall" imposes a "discretionless obligatio[n]," *Lopez* v. *Davis*, 531 U. S. 230, 241 (2001), a court considering a §2259 restitution request has no license to deviate from the statute's command. It must enter an order for the "full amount of the victim's losses," regardless of whether other defendants may have contributed to the same victim's harm.

If there were any doubt on the matter, Congress eliminated it in §2259(b)(4)(B)(ii), which bars a court from "declin[ing] to issue [a restitution] order under this section" on the ground that a victim "is entitled to receive compensation for his or her injuries from the proceeds of insurance or any other source." One "other source" from which a victim would be "entitled to receive compensation" is, of course, other offenders who possess images of her sexual abuse. It is unthinkable that Congress would have expressly forbidden courts to award victims *no* restitution because their harms have been aggregately caused by many offenders, only to permit restitution orders for a single penny for the same reason.

## B

As the majority recognizes, Congress did not draft §2259 in a vacuum; it did so in the context of settled tort law

traditions. See *ante,* at 14–15; see also *Meyer* v. *Holley*, 537 U. S. 280, 285 (2003) (Congress "legislates against a legal background of ordinary tort-related" principles). Section 2259 functions as a tort statute, one designed to ensure that victims will recover compensatory damages in an efficient manner concurrent with criminal proceedings. See Restatement of Torts §901, p. 537 (1939) (the purposes of tort law include "to give compensation, indemnity, or restitution for harms" and "to punish wrongdoers"); *Dolan* v. *United States*, 560 U. S. 605, 612 (2010) (the "substantive purpose" of the related Mandatory Victims Restitution Act of 1996, §3664, is "to ensure that victims of a crime receive full restitution"). And the nature of the child pornography industry and the indivisible quality of the injuries suffered by its victims make this a paradigmatic situation in which traditional tort law principles would require joint and several liability. By requiring restitution for the "full amount of the victim's losses," §2259(b)(1), Congress did not depart from these principles; it embraced them.

First, the injuries caused by child pornography possessors are impossible to apportion in any practical sense. It cannot be said, for example, that Paroline's offense alone required Amy to attend five additional minutes of therapy, or that it caused some discrete portion of her lost income. The majority overlooks this fact, ordering courts to surmise some "circumscribed" amount of loss based on a list of factors. *Ante,* at 21, 22–23; see also *ante,* at 7–10 (ROBERTS, C. J., dissenting). Section 2259's full restitution requirement dispenses with this guesswork, however, and in doing so it harmonizes with the settled tort law tradition concerning indivisible injuries. As this Court explained this rule in *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256 (1979), unless a plaintiff's "injury is divisible and the causation of each part can be separately assigned to each tortfeasor," the rule is that a

"tortfeasor is not relieved of liability for the entire harm he caused just because another's negligence was also a factor in effecting the injury." *Id.*, at 260, n. 8; see also Prosser and Keeton §52, at 347 (joint and several liability applies to injuries that "are obviously incapable of any reasonable or practical division"); *Feneff* v. *Boston & Maine R. Co.*, 196 Mass. 575, 580, 82 N. E. 705, 707 (1907) (similar).

Second, Congress adopted §2259 against the backdrop of the rule governing concerted action by joint tortfeasors, which specifies that "[w]here two or more [tortfeasors] act in concert, it is well settled . . . that each will be liable for the entire result." Prosser and Keeton §52, at 346. The degree of concerted action required by the rule is not inordinate; "if one person acts to produce injury with full knowledge that others are acting in a similar manner and that his conduct will contribute to produce a single harm, a joint tort has been consummated even when there is no prearranged plan." 1 F. Harper, F. James, & O. Gray, The Law of Torts §10.1, p. 699 (1st ed. 1956) (hereinafter 1 Harper and James); see also, *e.g., Troop* v. *Dew*, 150 Ark. 560, 565, 234 S. W. 992, 994 (1921) (defendants jointly liable for uncoordinated acts where they were "working to a common purpose").

Child pornography possessors are jointly liable under this standard, for they act in concert as part of a global network of possessors, distributors, and producers who pursue the common purpose of trafficking in images of child sexual abuse. As Congress itself recognized, "possessors of such material" are an integral part of the "market for the sexual exploitative use of children." §2251 Finding (12). Moreover, although possessors like Paroline may not be familiar with every last participant in the market for child sexual abuse images, there is little doubt that they act with knowledge of the inevitable harms caused by their combined conduct. Paroline himself admitted to

possessing between 150 and 300 images of minors engaged in sexually explicit conduct, which he downloaded from other offenders on the Internet. See 672 F. Supp. 2d 781, 783; App. 146. By communally browsing and downloading Internet child pornography, offenders like Paroline "fuel the process" that allows the industry to flourish. O'Connell, Paedophiles Networking on the Internet, in Child Abuse on the Internet: Ending the Silence 77 (C. Arnaldo ed. 2001). Indeed, one expert describes Internet child pornography networks as "an example of a complex criminal conspiracy," *ibid.*—the quintessential concerted action to which joint and several liability attaches.

Lastly, §2259's full restitution requirement conforms to what Congress would have understood to be the uniform rule governing joint and several liability for intentional torts. Under that rule, "[e]ach person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct." Restatement (Third) of Torts: Apportionment of Liability §12, p. 110 (2007). There is little doubt that the possession of images of a child being sexually abused would amount to an intentional invasion of privacy tort—and an extreme one at that. See Restatement (Second) of Torts §652B, p. 378 (1976) ("One who intentionally intrudes, physically or otherwise, upon [another's] private affairs or concerns, is subject to liability . . . if the intrusion would be highly offensive to a reasonable person").[4]

––––––––

[4] Possession of child pornography under §2252 constitutes an intentional tort notwithstanding that the offense requires a *mens rea* of knowledge. See §2252(a)(3)(B) (punishing one who "knowingly sells or possesses" child pornography). One is "said to act knowingly if he is aware '"that [a] result is practically certain to follow from his conduct."'" *United States* v. *Bailey*, 444 U. S. 394, 404 (1980). That definition is, if anything, more exacting than the kind of "intent" required for an intentional tort under the Restatement, which defines "intent" to include situations where an actor "believes that . . . consequences are substantially certain to result from [his act]." Restatement

Section 2259's imposition of joint and several liability makes particular sense when viewed in light of this intentional tort rule. For at the end of the day, the question of how to allocate losses among defendants is really a choice between placing the risk of loss on the defendants (since one who is caught first may be required to pay more than his fair share) or the victim (since an apportionment regime would risk preventing her from obtaining full recovery). Whatever the merits of placing the risk of loss on a victim in the context of a negligence-based offense, Congress evidently struck the balance quite differently in this context, placing the risk on the morally culpable possessors of child pornography and not their innocent child victims.

C

Notwithstanding §2259's text and the longstanding tort law traditions that support it, the majority adopts an apportionment approach based on its concern that joint and several liability might lead to unfairness as applied to individual defendants. See *ante,* at 15–22. The majority finds this approach necessary because §2259 does not provide individual defendants with the ability to seek contribution from other offenders. *Ante,* at 17–18. I agree that the statute does not create a cause of action for contribution, but unlike the majority I do not think the absence of contribution suggests that Congress intended the phrase "full amount of the victim's losses" to mean something less than that. For instead of expending judicial resources on disputes between intentional tortfeasors, Congress crafted a different mechanism for preventing inequitable treatment of individual defendants—the use of periodic payment schedules.

Section 2259(b)(2) directs that "[a]n order of restitution

––––––––––

(Second) of Torts §8A, p. 15 (1965).

under this section shall be issued and enforced in accordance with section 3664." Section 3664(f)(1)(A) in turn reiterates §2259's command that courts "shall order restitution to each victim in the full amount of each victim's losses." But §3664 goes on to distinguish between the *amount* of restitution ordered and the *schedule* on which payments are to be made. Thus, §3664(f)(2) states that a court "shall . . . specify in the restitution order . . . the schedule according to whic[h] the restitution is to be paid," and §3664(f)(3)(A) provides that "[a] restitution order may direct the defendant to make a single, lump sum payment" or "partial payments at specified intervals." Critically, in choosing between lump-sum and partial payments, courts "shall" consider "the financial resources and other assets of the defendant," along with "any financial obligations of the defendant, including obligations to dependents." §§3664(f)(2)(A), (C).

Applying these factors to set an appropriate payment schedule in light of any individual child pornography possessor's financial circumstances would not be difficult; indeed, there is already a robust body of case law clarifying how payment schedules are to be set under §3664(f). For example, Courts of Appeals have uniformly found it an abuse of discretion to require defendants to make immediate lump-sum payments for the full amount of a restitution award when they do not have the ability to do so. In such cases, Congress has instead required courts to impose periodic payment schedules. See, *e.g., United States* v. *McGlothlin*, 249 F. 3d 783, 784 (CA8 2001) (reversing lump-sum payment order where defendant "had no ability to pay the restitution immediately," and requiring District Court to set a periodic payment schedule); *United States* v. *Myers*, 198 F. 3d 160, 168–169 (CA5 1999) (same). The existing body of law also provides guidance as to proper payment schedules. Compare, *e.g., United States* v. *Calbat*, 266 F. 3d 358, 366 (CA5 2001) (annual payment of

$41,000 an abuse of discretion where defendant had a net worth of $6,400 and yearly income of $39,000), with *United States* v. *Harris*, 60 F. Supp. 2d 169, 180 (SDNY 1999) (setting payment schedule for the greater of $35 per month or 10% of defendant's gross income).

Section 3664's provision for partial periodic payments thus alleviates any concerns of unfairness for the vast number of child pornography defendants who have modest financial resources. A more difficult challenge is presented, however, by the case of a wealthy defendant who would be able to satisfy a large restitution judgment in an immediate lump-sum payment. But the statute is fully capable of ensuring just results for these defendants, too. For in addition to an offender's financial circumstances, §3664 permits courts to consider other factors "in the interest of justice" when deciding whether to impose a payment schedule. See §3664(f)(2) (district court shall specify payment schedule "pursuant to section 3572"); §3572(d)(1) (restitution order shall be payable in periodic installments if "in the interest of justice").

Accordingly, in the context of a restitution order against a wealthy child pornography possessor, it would likely be in the interest of justice for a district court to set a payment schedule requiring the defendant to pay restitution in amounts equal to the periodic losses that the district court finds will actually be "incurred by the victim," §2259(b)(3), in the given timeframe. In this case, for example, Amy's expert estimates that she will suffer approximately $3.4 million in losses from medical costs and lost income over the next 60 years of her life, or approximately $56,000 per year. If that estimate is deemed accurate, a court would enter a restitution order against a wealthy defendant for the full $3.4 million amount of Amy's losses, and could make it payable on an annual schedule of $56,000 per year. Doing so would serve the interest of justice because the periodic payment schedule

would allow the individual wealthy defendant's ultimate burden to be substantially offset by payments made by other offenders,[5] while the entry of the full restitution award would provide certainty to Amy that she will be made whole for her losses.

\*    \*    \*

Although I ultimately reach a different conclusion as to the proper interpretation of the statutory scheme, I do appreciate the caution with which the Court has announced its approach. For example, the Court expressly rejects the possibility of district courts entering restitution orders for "token or nominal amount[s]." *Ante,* at 21. That point is important because, if taken out of context, aspects of the Court's opinion might be construed otherwise. For instance, the Court states that in estimating a restitution amount, a district court may consider "the broader number of offenders involved (most of whom will, of course, never be caught or convicted)." *Ante,* at 23. If that factor is given too much weight, it could lead to exactly the type of trivial restitution awards the Court disclaims. Amy's counsel has noted, for instance, that in light of the large number of persons who possess her images, a truly proportional approach to restitution would

───────────

[5] As the facts of this case show, the offset would be significant. Between June 2009 and December 11, 2013, Amy obtained restitution awards from 182 persons, 161 of whom were ordered to pay an amount between $1,000 and $530,000. See Restitution Awards for Amy Through December 11, 2013, Lodging of United States. If these offenders (and new offenders caught each month) were instead ordered to pay the full amount of restitution in periodic amounts according to their financial means, a wealthy defendant's annual obligation would terminate long before he would be required to pay anything close to the full $3.4 million. For once a victim receives the full amount of restitution, all outstanding obligations expire because §2259 does not displace the settled joint and several liability rule forbidding double recovery. See Restatement (Second) of Torts §885(3) (1979), see also, *e.g., United States* v. *Nucci*, 364 F. 3d 419, 423 (CA2 2004).

lead to an award of just $47 against any individual de-
fendant.  Brief for Respondent Amy 65.  Congress obviously
did not intend that outcome, and the Court wisely refuses
to permit it.[6]

In the end, of course, it is Congress that will have the
final say.  If Congress wishes to recodify its full restitution
command, it can do so in language perhaps even more
clear than §2259's "mandatory" directive to order restitu-
tion for the "full amount of the victim's losses."  Congress
might amend the statute, for example, to include the term
"aggregate causation."  Alternatively, to avoid the uncer-
tainty in the Court's apportionment approach, Congress
might wish to enact fixed minimum restitution amounts.
See, *e.g.,* §2255 (statutorily imposed $150,000 minimum
civil remedy).  In the meanwhile, it is my hope that the
Court's approach will not unduly undermine the ability of
victims like Amy to recover for—and from—the unfathom-
able harms they have sustained.

––––––––––

[6] The Court mentions that Amy received roughly $6,000 from her
uncle, the person responsible for abusing her as a child.  *Ante,* at 2.
Care must be taken in considering the amount of the award against
Amy's uncle, however, *ante,* at 23, because as Amy's expert explained,
Amy was "back to normal" by the end of her treatment for the initial
offense.  App. 70.  It was chiefly after discovering, eight years later,
that images of her sexual abuse had spread on the Internet that Amy
suffered additional losses due to the realization that possessors like
Paroline were viewing them and that "the sexual abuse of her has
never really ended."  *Id.*, at 71.